## BOSTON IRON & METAL CO. et al. v. UNITED STATES.

### No. 3213.

Circuit Court of Appeals, Fourth Circuit.

Jan. 12, 1932.

WEBB, District Judge, dissenting.

Morton H. Rosen and Edward L. Ward, both of Baltimore, Md., for appellants.

Charles G. Page, Asst. U. S. Atty., and Simon E. Sobeloff, U. S. Atty., both of Baltimore, Md.

Before PARKER and NORTHCOTT, Circuit Judges, and WEBB, District Judge.

NORTHCOTT, Circuit Judge.

This is an action at law brought by the United States on a bond executed by the Boston Iron & Metal Company, a corporation, as principal, and Schapiro and Roney, the other appellants, as sureties, in the District Court of the United States for the District of Mary-

land. A trial was had before a jury in Baltimore, in March, 1931, and a verdict was returned against the defendants in the sum of $8,200, upon which verdict the court below entered judgment. From this judgment this appeal was brought.

The Boston Iron & Metal Company, hereinafter referred to as the company, entered into a written agreement of sale with the United States, through the Shipping Board, for the purchase of five steamships, for the sum of $175,000. The agreement, dated January 12, 1924, provided, among other things, that the buyer would "remove them from their respective locations on or before February 12th, 1924"; and (2) "on or before February 12th, 1925," would "scrap and dismantle said vessels in a manner and to such an extent as might be deemed necessary by the Seller to prevent their further use and operation as steamers"; (3) paragraph 3 of this agreement provides: "The Buyer further agrees to cause the hulls of said vessels to be scrapped, dismantled and/or destroyed in such manner and to such an extent as will prevent their further use and operation as vessels, barges or steamships." The agreement further provided that the seller could extend the time for removal and scrapping and dismantling said vessels by reason of weather conditions or other conditions beyond the control of the buyer.

The company gave bond, in the sum of $175,000, with Schapiro and Roney as sureties, conditioned that the contract would be well and truly performed in all of its terms, covenants, and agreements.

Paragraph 4 of said agreement of sale was as follows:

"Four: The Buyer agrees that should it fail to do any of the things in this agreement provided to be done by it, the Seller will be greatly damaged and that such damages cannot be ascertained with any degree of definiteness or certainty. In order to protect itself against such indefiniteness and uncertainty of liability the Buyer hereby covenants and agrees: (1) that should it fail to remove said vessels from their present respective locations on or before February 12th, 1924, or such extension of time as it may be entitled to under the provisions of Paragraph Two hereof, it will pay the Seller as and for liquidated damages and not a penalty the sum of One Hundred Dollars ($100.00) for each vessel not so removed for each and every day the Buyer shall be in default; (2) in the event the Buyer shall fail or refuse to scrap, dismantle, dismember and/or destroy any or all of said vessels in the United States on or before February 12th, 1925, or such extension of time as it may be entitled to under the provisions of Paragraph Two hereof, then in addition to said sum or sums of One Hundred Dollars ($100.00) for each vessel per day heretofore stipulated, the Buyer agrees to pay the Seller as and for liquidated damages, and not a penalty, the further sum of One Hundred Dollars ($100.00) for each vessel not so scrapped, dismantled, dismembered and/or destroyed for each and every day the Buyer shall be in default, and (3) in the event the Buyer shall fail or refuse to scrap, dismantle, dismember and/or destroy any or all of said vessels in the United States for a period of one hundred (100) days after February 12th, 1925, or such extension of time as it may be entitled to under the provisions of Paragraph Two hereof, then in addition to said sum or sums of One Hundred Dollars ($100.00) per day as heretofore stipulated the Buyer agrees to pay the Seller as and for liquidated damages, and not a penalty for such vessel or vessels not so scrapped, dismantled, dismembered and/or destroyed the further sum or sums to wit: For the 'Ascutney' Nine Thousand Dollars ($9,000.00); for the 'Amphion' Twelve Thousand Dollars ($12,000.00); for the 'Mercury' Forty Thousand Dollars ($40,000.00); for the 'Von Steuben' Sixty Four Thousand Dollars ($64,000.00) and for the 'Nansemond' Fifty Thousand Dollars ($50,000.00)."

The declaration contained two counts, the first alleging that there was three days' delay after February 12, 1924, in the removal of the Mercury, one of the ships sold under the agreement, from its then location, and asking $300 as liquidated damages for such delay, and the second alleging that there was eighty-two days delay after February 12, 1925, in scrapping and dismantling the Mercury, and in destroying her hull as agreed in the contract of sale, and asking $8,200 as liquidated damages for such delay. The jury found against the plaintiff on the first count and in its favor on the second count.

Only two questions of importance are raised by the appeal: First, whether there was a breach of the contract for the performance of which the bond was given; and second, whether the amount fixed to be paid in the event of a breach was a penalty or liquidated damages. If held to be a penalty, then only such damages as were actually proven could be recovered.

On the first point, the question of whether the contract was breached was a

question of fact for the jury. The jury found as to the second count that the contract had been breached. There was here ample evidence to sustain the verdict, and the courts will not invade the province of the jury under such circumstances. It was claimed that the verdicts of the jury on the two counts were inconsistent. We do not think so. The jury may well have reached the conclusion that the delay, as to the removal, was either justified or was approved by the United States, when no such conditions existed as to the destruction of the vessel and the hull.

On the second point, an examination of the contract of sale shows that the parties agreed that the $100 per day for each vessel was to be regarded as liquidated damage, and not to be regarded as a penalty. The parties also expressly agreed in the contract that the United States would be greatly damaged by the failure of the buyer to destroy the vessels and hulls, and that such damages could not be ascertained with any degree of certainty.

The United States was at the time of the contract engaged in an effort to build up its merchant marine, and it was deemed important that vessels should be destroyed within the time limit fixed by the contract. The government was engaged in an attempt in which the people and the public were greatly interested, and was entirely within its rights in contracting as it did. The company contracted for a consideration, presumably of great value, to destroy the vessels within the time fixed or pay a certain sum as liquidated damages. We do not think the company can deny its contract or escape the obligation it assumed.

As was said by Mr. Justice McReynolds in Kothe v. R. C. Taylor Trust, 280 U. S. 224, 50 S. Ct. 142, 143, 74 L. Ed. 382: "The courts are 'strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained. * * * The question always is, what did the parties intend by the language used? When such intention is ascertained it is ordinarily the duty of the court to carry it out.' And see United States v. United Engineering Co., 234 U. S. 236, 241, 34 S. Ct. 843, 845, 58 L. Ed. 1294: 'Such contracts for liquidated damages, when reasonable in their character, are not to be regarded as penalties, and may be enforced between the parties.' But agreements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced."

Where damages are readily ascertainable, an amount largely in excess of such damages will be treated as a penalty, but where, as here, the actual damage is impossible of ascertainment, the parties are bound by the amount stipulated in the contract.

"From a critical examination of all these cases and others that might be referred to, it will be found that the business of the court, in construing this clause of the agreement, as in respect to every other part thereof, is to inquire after the meaning and intent of the parties; and when that is clearly ascertained from the terms and language used, it must be carried into effect. A court of law possesses no dispensing powers; it cannot inquire whether the parties have acted wisely or rashly, in respect to any stipulation they may have thought proper to introduce into their agreements. If they are competent to contract within the prudential rules the law has fixed as to parties, and there has been no fraud, circumvention, or illegality in the case, the court is bound to enforce the agreement. Men may enter into improvident contracts where the advantage is knowingly and strikingly against them; they may also expend their property upon idle or worthless objects, or give it away if they please without an equivalent, in spite of the powers or interference of the court; and it is difficult to see why they may not fix for themselves by agreement in advance, a measure of compensation, however extravagant it may be, for a violation of their covenant (they surely may after it has accrued), without the intervention of a court or jury. * * *

" 'When the parties to a contract, in which the damages to be ascertained, growing out of a breach, are uncertain in amount, mutually agree that a certain sum shall be the damages, in case of a failure to perform, and in language plainly expressive of such agreement, I know of no sound principle or rule applicable to the construction of contracts that will enable a court of law to say that they intended something else. Where the sum fixed is greatly disproportionate to the presumed actual damage, probably a court of equity may relieve; but a court of law has no right to erroneously construe the intention of the parties, when clearly expressed, in the endeavor to make better contracts for them than they have made for themselves. In these, as in all other cases, the courts are bound to ascertain and carry into effect the

true intent of the parties. I am not disposed to deny that a cause may arise in which it is doubtful, from the language employed in the instrument, whether the parties meant to agree upon the measure of compensation to the injured party in case of a breach. * * * In such cases, there would be room for construction; but certainly none where the meaning of the parties was evident and unmistakable.' " Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 22 S. Ct. 240, 251, 46 L. Ed. 366.

In Eagle Indemnity Co. v. United States (C. C. A.) 22 F.(2d) 388, will be found a discussion as to the law applicable to bonds of this character, given to the United States, in the carrying out of transactions of public interest.

See, also, Wise v. United States, 249 U. S. 361, 39 S. Ct. 303, 63 L. Ed. 647; Maryland Company v. United States, 241 U. S. 184, 36 S. Ct. 545, 60 L. Ed. 945; Bedford v. J. Henry Miller (C. C. A.) 212 F. 368; Detroit Co. v. Wyatt Co. (C. C. A.) 1 F.(2d) 788, 789; Matta v. Tillinghast (C. C. A.) 33 F. (2d) 64; United States v. Rubin (D. C.) 227 F. 938.

This court also said in Detroit Co. v. Wyatt Co., supra: "The contract is impressed with a strong presumption that the officers and counsel of these large corporations knew the meaning of the language they used and intended what they said. * * * The courts will disregard the expressed intention of the parties to provide for such liquidated damages only when the principle of compensation is evidently disregarded."

It was contended on behalf of appellants that there was no time limit fixed by the contract in which the hull of the Mercury should be destroyed. Reading the contract as a whole, as it must be read, it will be seen that paragraph 3 of the contract, referring to the hull, is in explanation and amplification of paragraph 2 under which the buyer agreed to perform the work of dismantling and scrapping "in a manner and to such an extent as may be deemed necessary by the Seller to prevent their further use and operation as steamers." The language of section 2 of paragraph 4 shows clearly that the damages therein provided for were contemplated in event of failure to complete the destruction in the manner provided for in paragraph 3.

The hull was included in the contract of sale, and the condition of the bond was that the contract of sale would be well and truly performed in every respect. The jury decided that the agreement was not carried out.

Objections are urged to the instructions given by the trial judge, but an examination of the instructions shows these objections to be without merit.

There was no error in the trial, and the judgment of the court below is affirmed.

WEBB, District Judge (dissenting).

On a careful reading and re-reading of the testimony in this case, I am of the opinion that the Mercury was sufficiently scrapped, dismantled, or destroyed to meet the spirit of the contract and bond. I think the evidence convinces that there was nothing left of the Mercury except her hull, in which a dozen large holes, including one 6 feet by 24 feet, had been made just above the water line.

The evidence, I think, convinces that there was very little, if any, change in the dismantling of the vessel between February 12 and May 20, 1925. On this latter date Mr. Merrill, district director of the plaintiff in Baltimore, wrote the manager of the branch in New York a letter in which, among other things, he said that he had inspected the vessel on that date, and "that vessel has been dismantled and she is of no further use for either a steamship or a barge that could be put in service again. The above company has dismantled the engine by cutting the crank shaft connecting rods, together with the housing and piston rods. They have also cut the heads out of the boilers, and furnaces are destroyed, preventing any further use as steam generators. The steering engine has been destroyed by cutting various bars for scrapping. This will apply also to the anchor windlass and capstan together with auxiliary machinery throughout the vessel. The decks have been removed, houses cut and stacks removed from the steamer. Several holes have been cut just above the water line in shell plate and frames cut in the various holds of the steamer. In our opinion, the Boston Iron and Metal Company has complied with the terms of the contract as far as this steamer being of any further use for commercial purposes."

The evidence shows further that no one ever heard of a vessel of the Mercury's length being used as a barge, and to condition her would cost so much as to be prohibitive. Evidently those in charge of the Shipping

Board's affairs for three years after this letter was written had that opinion about the matter; for a period of more than three years elapsed before this action was brought to recover the damages sued for.

I therefore feel that the trial judge should have given the defendants' first prayer, to wit: "The defendants pray the Court to declare as a matter of law that the plaintiff has submitted no evidence in this case legally sufficient to entitle the plaintiff to recover and, therefore, the verdict of the jury must be for the defendants upon the issues joined in the pleadings."

The court having declined to give this first prayer asked for by the defendants, I certainly think the defendants' second prayer should have been given, that is: "That the provision in the contract offered in evidence between the United States of America and the defendants and the provision in the bond given by the defendants for the faithful performance of the contract for the payment, in the event that the steamship Mercury was not removed prior to February 12, 1924, and that it was not dismantled or destroyed as provided in the contract prior to February 12, 1925, of the sum of $100 per day, is a penalty and is not liquidated damages. Therefore, there can be no recovery in this action in respect thereof."

The amounts provided for in the contract and the bond, as liquidated damages, are so extremely out of proportion to any actual damage that might have been suffered by reason of the breach of either the bond or the contract that I am compelled to consider these amounts as penalties and not as liquidated damages. What damage did the government suffer by reason of the old hull of the steamer lying for a few days in the waters of a private dock? None. And no actual damage was shown or attempted to be shown on this account, and I do not feel that the government should recover $8,200 as damages from the defendants, where there is absolute absence of any damage proven or even conceived. To all intents and purposes the Mercury was demolished as a vessel. She was as impotent and useless as if she had been sunk in the middle of the ocean.

I think I can clearly distinguish the cases relied upon by the plaintiff from the facts and law in this case.

For the foregoing reasons, I must dissent, because I feel that upon all the facts and the law in the case judgment should have been rendered for the defendants.