# ANNE ARUNDEL COUNTY, MARYLAND v. NORAIR ENGINEERING CORPORATION

[No. 239, September Term, 1974.]

*Decided July 8, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*John M. Court, Assistant County Solicitor,* with whom were *Paul F. Borden, County Solicitor, Michael R. Roblyer, County Solicitor,* and *Charles Fred Delavan, Assistant County Solicitor,* on the brief, for appellant.

*Jerome T. May,* with whom were *David R. Cuttler* and *Blumenthal, Goldsborough & May* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellee, Norair Engineering Corporation (Norair), contracted with appellant, Anne Arundel County (the County), to construct in the County the Broadneck Wastewater Treatment Plant. After construction was well under way a large outfall line extending from a chlorine contact chamber to a manhole structure near the shoreline of the Chesapeake Bay was discovered to have pulled apart or to have moved to such an extent that the danger of separation appeared imminent, thus producing this litigation.

Norair sued the County for the extra work involved in correction of this problem. The matter was tried without a jury. The trial judge entered judgment in favor of Norair against the County for $62,241.97, of which $50,741.97 was for this extra work and $11,500 was in connection with a dispute relative to funds that had been retained by the County as a result of its claim for liquidated damages.

The matter reaches us on direct appeal. We shall affirm the judgment relative to the extra work, but on the issue of liquidated damages we shall remand for further proceedings.

Four questions are presented on appeal, (1) whether the judge who considered an earlier law motion erred as a matter of law in sustaining Norair's exceptions to the County's demand for a bill of particulars; (2) whether the trial court "err[ed] as a matter of law in denying the County's special plea of limitations as to the first Count"; (3) whether the trial court "err[ed] as a matter of law under the contract in finding the County rather than the contractor responsible for the repairs to the outfall line which occasioned the damages claimed in Count I"; and (4) whether the trial court "err[ed] as a matter of law under the contract in finding that the County was either required or failed to demonstrate damage sufficient to recover liquidated

damages stipulated in the contract as to Count III." We shall develop facts in the process of discussing these questions.

## I

## The Demand for Particulars

Count I of the Declaration consisted of three paragraphs, the first two of which were the common counts relative to work done and materials provided and money found to be due on accounts stated, respectively. The third paragraph of that count was as follows:

> "3. and for that on August 19, 1968 in consideration of the sum ot Two Million, Four Hundred Fifty Thousand ($2,450,000.00) Dollars Plaintiff contracted with Defendant to construct the Broadneck Wastewater Treatment Plant in Anne Arundel County, Maryland. That the Plaintiff performed its side of the contract in its entirety according to specifications provided by the Defendant but was also required to perform additional work, as permitted under the contract, due to deficiencies and omissions in the specifications for the project, as provided by Defendant. That the additional work was not caused by any fault of the Plaintiff. That the Plaintiff was forced to repair the 48 foot outfall line on the project due to the improper specifications causing additional expense over and above the contract price, which the Defendant has refused to pay thereby breaking the contract, and the Plaintiff claims the sum of Fifty Thousand Seven Hundred Forty-One Dollars and Ninety Seven Cents ($50,741.97)."

The demand for particulars here under consideration was:

> "1. With respect to Count 1, subparagraph 3, please state what repairs were accomplished to the 48' outfall line and which specifications are alleged

> to have been improper and to have caused additional expense above the contract price."

Norair excepted to that demand as improper, claiming that "[t]he information demanded [was] a matter of evidence to prove [Norair's] claim, and [was] not necessary in order to give sufficient notice of the claim," that "[i]t m[ight] not be obtained by particulars, but only, if at all, by interrogatory or other discovery procedure." This exception was sustained, thus producing the County's assignment of error.

First of all, it must be noted that the demand for particulars is not of the first two paragraphs of the first count, the two common counts. Under the statute as it existed for many years prior to 1957 (Maryland Code (1951) Art. 75, § 28 (107) being the most recent codification), a bill of particulars could be obtained as a matter of right "where the pleading [was] so general as not to give sufficient notice to the opposite party of the evidence to be offered in support of it." This was interpreted to require particulars of a common count upon request. *See* 1 Poe, *Pleading and Practice* § 136 (5th ed. Tiffany 1925). The present Maryland Rule 346 a provides for "a bill of particulars whenever a pleading is so general as not to give sufficient notice to [a defendant] of the claim ... asserted by such pleading," which has been interpreted as effecting a change in the former rule. *See* editor's note to Rule 346 a. It is in the light of this rule that the present request must be examined.

In *Sommers v. Wilson Bldg. & L. Ass'n*, 270 Md. 397, 311 A. 2d 776 (1973), we had before us a demurrer to a declaration. We said relative to the declaration:

> "Even a careful examination leaves one at a loss in determining whether the declaration sounds in assumpsit or tort, or whether it represents an effort by the pleader to impermissibly combine these two forms of action into a single count." *Id.* at 400.

We concluded that the declaration was vulnerable to attack on demurrer and that the interests of justice would be

promoted by remanding the case without affirmance or reversal in accordance with Rule 871 a, with leave to file an amended declaration. However, in acceding to the request of the appellant that he be given an opportunity to file an amended declaration, Judge Digges said for the Court:

"This request is granted in part because confusion has resulted from the appellees' erroneous utilization of Rule 346 (demand for particulars) to procure information which is only obtainable under the deposition and discovery rules (Rules 400-425). Here, the demand sought the particulars of *all* agreements and understandings between the parties, written or otherwise, whether they formed the basis of the action or not, concerning the duty of the appellees to keep the appellants' property insured. Such a broad request under Rule 346 is improper. Particulars are only permitted to satisfy the demands of pleading. *Cline v. Fountain, etc., Company*, 214 Md. 251, 134 A. 2d 304 (1957). On the other hand, if a party desires the extensive information requested here, interrogatories and other forms of discovery are the proper tools to be utilized. The discovery rules are designed to satisfy the cravings of a litigant to acquire pretrial knowledge of the contentions being made by opposing parties, as well as all facts relevant to the dispute. In fact, a bill of particulars is rarely used today as its function has been largely made obsolete by the rules governing discovery and summary judgment. *Nicholson v. Blanchette*, 239 Md. 168, 188, 210 A. 2d 732 (1965); *Hub Bel Air, Inc. v. Hirsch*, 203 Md. 637, 641, 102 A. 2d 550 (1954)." *Id.* at 401-02. (Emphasis in original.)

It must be remembered that our present discovery practice is of comparatively recent origin, dating from the adoption by the Court of General Rules of Practice and Procedure on January 30, 1941, effective September 1, 1941, "pursuant to the 18th Section of Article 4 of the Constitu-

tion of this State, and Chapter 719 of the Acts of the General Assembly of 1939." All of the information sought by the County here was available to it under Chapter 400 of the Maryland Rules and could well have been obtained by interrogatories under Rule 417. The third paragraph of the first count of the declaration "g[ave] sufficient notice to [the County] of the claim . . . asserted by such pleading." Accordingly, Judge Melvin did not err in sustaining the exceptions to the demand.

## II and III

### Denying the Plea of Limitations to the First Count and Holding the County Responsible for Repairs to the Outfall Line

On this count the trial judge, sitting as the trier of fact, said in his memorandum opinion:

### "COUNT I

"Count one embodies the common counts for work and materials and for money found to be due between plaintiff and defendant. It also contains a special count alleging a contract between plaintiff and defendant dated August 19, 1968 which plaintiff asserts had been fully performed. However, it goes on to state that it was required to perform additional work as permitted under the contract due to deficiencies and omissions in the specifications in that it was required to repair a forty-eight inch outfall line due to improper specifications. The defendant refused to pay the expense of the repair, thereby allegedly breaking the contract.

"To this count the defendant has entered the special plea of limitations as well as a defense.

"The limitations defense is inappropriate.

"Exhibit one which was entered into evidence without objection and purports to be the

Specifications Proposal Contract and Bond for Contract No. 580-BS — Broadneck Wastewater Treatment Plant on page A-3 indicates [1] that it is a sealed instrument. Such being the case, this case was filed well within the twelve-year period of limitations for such a contract. [Code (1974) § 5-102 (a) (5) of the Courts and Judicial Proceedings Article.] Even if somewhere within this weighty document there were contained a three-year limitation provision, the last payment made by the County on account of the contract was dated March 5, 1971. Suit was filed March 14, 1973, also within the three-year limitation apparently urged by defendant. . . .

"The nature of the claim arises over the fact that on or about November 19, 1969, an inspector surveying the effluent line in question which extended from the chlorine contact chamber to a manhole structure located distant therefrom some 1000 feet and near the shoreline of the Chesapeake Bay, discovered that some of the sections of pipe which were generally 16 feet in length had either pulled apart completely or had moved to such an extent that danger of separation appeared imminent. The entire line had moved twenty inches toward the outfall structure . . . . When this fact was called to the attention of the project engineer for Norair, he immediately directed that all work stop on the line. A meeting was held with the principals to determine what could be done. The County officials blamed the condition upon gross neglect . . . on the part of the plaintiff; the plaintiff attributed the problem on design deficiencies. The court finds that plaintiff has the better of the argument.

---

"1. The exhibit is a blank copy, but the court assumes that the original is fully executed by both parties.

"Details of the line are graphically presented on Exhibit 2, the working drawing.

"The outfall line was made of prestressed concrete cylinder pipe to be placed in stable soil to a point approximately 259 feet from the north face of the chlorine contact chamber. At that point, the placement was to be made for the remaining distance in unstable soil and muck typical of tidal marsh material found in the Chesapeake Bay region. Beginning four pipe sections in the stable area, the plans called for the pipe to be supported on pile 'bents.' These bents consisted of a creosoted pile driven on either side of the pipe line, the plane formed by the piles being perpendicular to the center line of the pipe. This pair of piles was then notched to receive a pair of four inch by twenty inch timber wales — horizontal beams — bolted to the piles at the precise elevation for the particular station. These bottom wales would provide a stable platform to support the pipe as it was placed on grade. Shifting of the pipe in a lateral direction was to be prevented by a pair of tapered wooden chocks secured to the bottom wales in such a fashion that the tapered faces contacted the outside diameter of the pipe. Once the pipe had been placed on the lower wales, a second pair of four by sixteen inch wales were placed horizontally in contact with the top of the pipe and bolted to the piles. There was no requirement that the upper wales were to exert a compressive force upon the top of the pipe.

"Exhibit 2 indicated that from station 2+11 to station 8+41 the pipe sections were to be laid with the spigot ends toward the Bay. In other words, down hill. From station 8+41 to station 9+90 the Exhibit 2 called for 10 sections of pipe to be laid in the opposite direction, or up hill. This drawing was later revised, however, when a pipe laying schedule, Exhibit 4, was issued by the pipe manufacturer.

The schedule was approved by the County's consulting engineer. It called for the laying to commence 4 feet six inches from center line of pipe to face of contact chamber, and 'lay bells ahead up station' ('up station' would necessitate laying pipe toward the Bay — or downward, the difference in elevation between the beginning and the end being 8.45 feet — 2.83 feet or 5.62 feet over the entire distance). While the plan as originally drawn, Exhibit 2, indicated the spigot end of the pipe to be laid up-station, the copy furnished the court indicates a pencilled revision showing the bell end to be laid up station consistent with the pipe laying schedule. Section 10-03 of the specification required that installation of all concrete pipe shall be in strict accordance with the manufacturer's instructions and recommendations.

"The specifications also required the contractor to refill all excavations as rapidly as possible after completion of the work therein, or after the excavations have served their purpose. . . . Pursuant to this provision only two sections of pipe were allowed to be exposed at one time. It was County policy to back-fill as rapidly as possible to avoid the hazard of anyone falling into the excavation and to protect the completed work.

"In the entire design of the system there was no provision whatsoever to guard against longitudinal movement, even though at the point of greatest movement unstable earth existed to an approximate depth of twenty-two feet below the finished grade of the pipe bottom.

"James J. Schnabel, a professional engineer and soil mechanics expert produced by plaintiff, testified that timber piles driven for pipe support were off as much as 1-1/4 inches *per foot* with directional movement generally toward the man hole. Specifications required that all piles be driven

in the presence of the engineer and would be considered plumb if their batter did not exceed $1/4$ inch per foot . . . . Mr. Schnabel further was of the opinion that longitudinal pressures from the method of progressive backfilling would result in cumulative movement towards the soft deposits of marsh vegetation with the sections of pipe being carried along with this force.

"The County argues that had plaintiff followed the usual engineering practice and worked down-station (uphill) instead of up-station (down-hill) and backfilled at a constant level throughout the length of the line after the entire line had been completed, the problem would never have arisen. That this is so, it argues, is self-evident in that once that procedure was followed, the line remained stable and no further difficulty was encountered since no other provisions were taken to prevent horizontal movement.

"In the first place, there was no testimony from which the court could conclude that it was customary in such projects to work from the lower to the higher elevation. Secondly, had this been done it would have been violative of the contract specifications, since the manufacturer's directions clearly called for laying the pipe up-station and as a result of this the County revised exhibit 2 to provide for working upstation. Moreover, had the pipe been laid downstation, each succeeding pipe section would have had to be supported in a sling or some such device and adjusted to proper elevation until joined to the next pipe section — a highly awkward and inefficient procedure. Plaintiff's specifications also called for immediate back filling. Additional steps were taken by the subcontractor to prevent longitudinal movement in that 'dead men' [2]

---

[2]. An anchoring device buried in the ground to which a structure is attached to prevent movement.

were placed at regular intervals and the pipe anchored to them .... Plaintiff's subcontractor initially followed the County's specifications precisely, except that upon uncovering the line it was found that some of the top wales were not in contact with the top of the pipe as called for in the plans. The County's inspector in Exhibit D, p. 6, noted that these wales were installed with top wale touching the pipe. The only possible conclusion which can be drawn from this set of circumstances is that the County's requirement for progressive back-filling created upward pressures which floated or lifted the pipe off the bottom wale before the top wale could be secured in place, since the weight of the pipe in and of itself would have kept it in place had not an extraneous lifting pressure been previously exerted.

"Attempt was made by defendant to attribute the shifting of the piles to the method of removal of the overburden, but the court has heard no convincing evidence of this. While it was reported that backfill was placed longitudinally with the pipe rather than transversely as suggested by the County's inspectors, there was no prohibition as to the longitudinal backfill method in the specifications. Since the subcontractor was not a designer of the structure, it could scarcely be held responsible for inherent design deficiencies which failed to guard against structure movement in a medium recognized to be unstable.

"Therefore, in the first count the court will award judgment to the plaintiff in the amount of $50,741.97 . . . , there having been *no contest* as to the unreasonableness of this charge." (Emphasis in original.)

We perceive no error of law in that opinion, nor, as to the factual matters there set forth, can we say that "the judgment of the lower court . . . [is] clearly erroneous . . . ." Maryland Rule 886.

## IV

### Liquidated Damages

The contract provided in paragraph 4-07 (a) for the County to "determine the number of calendar days, if any, that the Contractor is in default in completing the contract" and that "[f]or each calendar day of default, the Contractor sh[ould] pay the County the sum of $150.00, which sum [was] [t]hereby agreed upon, not as a penalty, but as liquidated damages which the County w[ould] suffer by reason of such default . . . ." The County originally assessed liquidated damages for 77 days, but ultimately concluded that 58 days was the proper number of days, thus producing a dispute here as to $8,700.00. The trial judge found "that the County having sustained no demonstrable damage arising from [Norair's] delay in completion of the project, the assessment of the per diem sum of $150 per day was completely unrealistic and bore no relation to any justifiable claim on the County's part and constituted an unenforceable penalty," a point which, of course, is here urged by Norair. We do not agree.

In *Balto. Bridge Co. v. U. Rwys. & E. Co.*, 125 Md. 208, 93 A. 420 (1915), Judge Pattison said for this Court:

> "From the authorities given above it may be stated as a settled rule of law, that where the parties, at or before the time of the execution of the contract, agree upon and name a sum therein to be paid as liquidated damages, in lieu of anticipated damages which are in their nature uncertain and incapable of exact ascertainment, that the amount so named in the agreement will be regarded as liquidated damages and not as a penalty, unless the amount so agreed upon and inserted in the agreement be grossly excessive and out of all proportion to the damages that might reasonably have been expected to result from such breach of the contract. And whether it is excessive or whether the damages are incapable of exact ascertainment should be determined from the

subject-matter of the contract considered in the light of all the surrounding facts and circumstances connected therewith and known to the parties at the time of its execution. That these questions should be considered and determined from the contract itself, its subject-matter and the surrounding facts and circumstances connected therewith with which the parties are confronted at the time of its execution, is made necessary in order to ascertain the intention of the parties, which is one of the essential factors in deciding whether the stipulation is for liquidated damages or is a penalty. It may afterwards be disclosed that the damages actually sustained are more or less than those anticipated at the time of the execution of the contract. If more, this fact would not characterize or stamp the stipulation as a penalty unless it was so exorbitant as to clearly show that such amount was not arrived at in a *bona fide* effort, made at or before the execution of the contract, to estimate the damages that might have been reasonably expected to result from a breach of it, and that it was named as a penalty for such breach. And on the other hand, if the amount stipulated was found to be inadequate, a greater amount could not be recovered for such breach, because of the agreement between the parties that the amount so named should be in lieu of the damages resulting therefrom." *Id.* at 214-15.

In that case the plaintiff had entered into a contract to do certain work upon a viaduct of the defendant in Baltimore City. The contract was to be completed "within four months from the date of the agreement, or sooner if possible." It was agreed that if the work was not completed at the required time the owner was authorized to retain as liquidated damages the sum of $25 for each day the work remained unfinished after the date designated for its completion. As the Court put it, "the inquiry . . . [was], whether the amount stipulated in the agreement to be paid by the appellant in

the event of its failure to complete the work within the designated period, [was] to be regarded as liquidated damages or as a penalty." The Court found the charge in that instance to be one for liquidated damages. This holding remains viable today. *Traylor v. Grafton,* 273 Md. 649, 667-668, 332 A. 2d 651 (1975); *Goldman v. Conn. Gen. Life Ins. Co.,* 251 Md. 575, 582, 248 A. 2d 154 (1968); *H. J. McGrath Co. v. Wisner,* 189 Md. 260, 264-265, 55 A. 2d 793 (1947); and *Hammaker v. Schleigh,* 157 Md. 652, 667, 147 A. 790 (1929). Moreover, as Judge Parke said for the Court in *Hammaker,* "[i]t is a question of law whether the provision is penal or only a liquidation of damages."

It will be noted that the determination of whether the amount specified is a penalty or liquidated damages is to be determined as of the time of execution of the contract. The damages in this instance that would be suffered by the County by delay obviously would be difficult of ascertainment. The amount specified, $150 per day, is not grossly excessive nor is it out of all proportion to the damages that might reasonably be expected to result from breach of the contract, particularly when it is noted that the full contract price was $2,450,000. Accordingly, we conclude that the trial judge erred in awarding Norair the full sum retained by the County as liquidated damages. Since he did not address himself to the number of days for which the County might properly claim liquidated damages, the case must be remanded for a determination on that point.

> *Judgment affirmed in part and reversed in part and case remanded to the Circuit Court for Anne Arundel County for further proceedings consistent with this opinion; one-half costs to be paid by Anne Arundel County and one-half by Norair Engineering Corporation.*