46 F.3d 1123
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
FONAR CORPORATION, Plaintiff-Appellee,
v.
TOMSCO IMAGING, INCORPORATED, Defendant-Appellant,
and
Vinod BHALLA, Doctor, Individually, t/a Exchange
Technologies, Incorporated, t/a E.T.I., Defendant.
 No. 94-1635.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 31, 1994.
Decided: January 9, 1995.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Daniel E. Klein, Jr., Magistrate Judge. (CA-92-1784-S)
 ARGUED: John A. Austin, Towson, MD, for Appellant. J. Martin McDonough, Jr., Baltimore, MD, for Appellee. ON BRIEF: Mark Ira Cantor, Baltimore, MD, for Appellee.
 D.Md.
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges. OPINION
 PER CURIAM:
 
 
 1
 In June of 1992, plaintiff-appellee Fonar Corporation filed a diversity suit for breach of contract in the District of Maryland against Tomsco Imaging, a group of doctors, and Dr. Vinhood Bhalla, a physical therapist. Both defendants filed Motions to Dismiss. The motion was granted as to Bhalla for lack of jurisdictional amount and denied as to Tomsco. The case was then heard non-jury by consent of the parties before a magistrate judge. The magistrate judge found for Fonar, and ordered Tomsco to pay $95,000 in damages. The magistrate judge calculated damages by reference to a penalty clause in the contract, but allowed Tomsco a set-off for amounts Tomsco had previously paid to Fonar. We vacate the damages amount and remand for recalculation of damages, but otherwise affirm the magistrate judge's findings.
 
 
 2
 The evidence at trial showed that Bhalla had purchased a magnetic resonance imaging (MRI) machine and a servicing agreement from Fonar, but in January of 1991 had defaulted on his servicing agreement payments. Bhalla then approached Tomsco about performing MRIs on Tomsco doctors' patients in exchange for patient fees divided between the doctors and Bhalla. Although Tomsco never signed an agreement with Bhalla, Bhalla moved his machine to the offices of Tomsco and began performing MRIs on Tomsco patients. The MRI machine performed erratically, and needed servicing. Bhalla contacted Fonar about a new service contract, and Bhalla signed a contract with Fonar whereby Bhalla would pay $10,250 per month for a year for servicing. The contract never became operative, however, because Bhalla never paid the initial amount due.
 
 
 3
 Over Thanksgiving of 1991, the MRI machine stopped functioning, leaving Tomsco patients waiting. Bhalla approached the Tomsco doctors, showed them the signed standard service contract he had from Fonar, and asked them to contact Fonar. The Tomsco doctors telephoned an official of Fonar at his home and requested immediate servicing on the MRI machine owned by Bhalla. The Fonar official told them that Fonar could not honor the servicing contract with Bhalla because Bhalla had not made any payments on his contract. Tomsco offered to pay for part of the servicing costs if Fonar could fix the machine quickly.
 
 
 4
 Recollections of the phone conversation differed in one important respect. The doctor who testified for Tomsco did not recall any discussions of a $25,000 figure, whereas the Fonar official recalled explaining that, because the MRI machine had not been serviced for some time, the initial servicing costs might well be $25,000 per month. He also recalled telling the doctors that if they wanted a contract immediately, before Fonar could evaluate the machine to determine the extent of repairs needed, he would need some assurance that Fonar would be able to recoup its anticipated outlay to repair the machine. It appears that the magistrate judge, in his verdict for Fonar, believed the testimony of its official.
 
 
 5
 After the disputed conversation, the Fonar official faxed the doctors the following signed contract proposal:
 
 
 6
 The purpose of this letter is to structure an agreement with Tomsco directly that would enable Fonar to honor the Service Agreement that has been signed by [Bhalla].
 
 
 7
 Fonar has received a signed Service Agreement from [Bhalla].... Fonar will Accept and Authorize service to commence provided Tomsco agrees to pay $10,250 per month for a minimum of twelve (12) months.... The rate of $10,250 per month for service is based on a full year of service. If less than a full year of service is taken, the rate per month is $25,000.
 
 
 8
 If you agree with these terms, please sign where indicated below and fax a copy of this letter and a copy of the first check made out to Fonar for $10,250. You should then send to us the letter and the check by Federal Express.... Upon receipt of these, Fonar will immediately dispatch a service engineer.
 
 
 9
 Fonar Corporation Agreed to and accepted: Date:
 
 
 10
 The doctors reduced the $10,250 figure on the letter to $7,500 each time it was mentioned by crossing out the old figure and writing in the new one. Upon advice of counsel, they also typed in a sentence at the end of the letter stating: "This agreement includes a standard service contract as issued by Fonar and to be reviewed and approved by the officers of Tomsco Imaging." The Tomsco doctors then signed and dated the letter at the notation "Agreed and accepted," faxed a copy to Fonar, and sent the letter to Fonar by Federal Express with a $7,500 check, the payment for the initial month.
 
 
 11
 Upon receipt of the fax, and even before receiving the check and signed letter, Fonar dispatched to Tomsco a service technician who started the MRI machine functioning again. Fonar also sent Tomsco a lengthy standard service contract with a handwritten change of the payment terms to "$7,500 per month (in accordance with letter Agreement dated Nov. 29, 1991)" and a letter asking the doctors to sign the standard contract. The standard contract contained no mention of a $25,000 charge. Apparently, the doctors never signed that contract.
 
 
 12
 Tomsco continued paying $7,500 per month beginning on or about Thanksgiving of 1991 and continuing through March, 1992, and Fonar continued providing servicing through April, 1992. Tomsco and Fonar dispute the quality of the servicing during that period. Tomsco has claimed that the MRI machine had an unacceptable 5 percent down time, whereas Fonar has stated that it had an excellent 97 percent up time. Fonar produced evidence that it spent over $100,000 in parts and labor during those months on servicing the machine, and that Tomsco never complained to Fonar about servicing. Sometime in April, Tomsco told Bhalla to take the machine away, and began sending patients elsewhere for MRIs. When Fonar did not receive a payment for April, Fonar demanded payment from Tomsco and Tomsco refused. Fonar then instituted the instant suit.
 
 
 13
 The magistrate judge found for Fonar. He found that the letter was a valid contract, that the terms of the contract were easily understood by educated people such as doctors, and that the terms required twelve months of servicing for $7,500 monthly or $25,000 monthly if the contract were terminated earlier. He also decided that Tomsco had not proven by a preponderance of the evidence an affirmative defense that Fonar had breached the contract by poor servicing prior to Tomsco's breach. The magistrate judge had previously, during the course of the trial, stated that he would find the $25,000 clause was not a penalty clause if he had an opportunity to address the question, but it does not appear that the question was ever explicitly returned to. The magistrate judge awarded $95,000 to Fonar, based on $25,000 monthly for the five months of service rendered, implicitly holding that the provision for $25,000 per month was not a penalty clause. He set off the $7,500 which Tomsco had paid monthly for four months, i.e., $30,000.
 
 I. Fonar's initial letter
 
 14
 We review findings of fact by a trial court sitting without a jury for clear error, with due regard for the opportunity of the trial court to judge the credibility of the witnesses. F.R.Civ.P. 52(a).
 
 
 15
 Tomsco has argued that the magistrate judge committed clear error in finding that the November faxed letter constituted a binding contract between the parties, contending that the language in the letter stating that "[t]he purpose of this letter is to structure an agreement ...." is evidence that the parties intended the letter to be an agreement to negotiate, non-binding under the law of Maryland, see First National Bank of Maryland v. Burton, Parsons & Co., 57 Md.App. 437, 470 A.2d 822, 828, cert. denied, 300 Md. 88, 475 A.2d 1200 (1984). Tomsco has further argued that the language added by Tomsco to the letter on advice of counsel--"This agreement includes a standard service contract as issued by Fonar and to be reviewed and approved by the officers of Tomsco Imaging"--indicates that essential terms of the contract had not been decided at the time the letter was signed. Because Maryland courts have held that an agreement is not a binding legal contract when " 'an essential element is reserved for the future agreement of both parties,' " First National Bank of Maryland, 470 A.2d at 828 (quoting Samuel Williston, A Treatise on the Law of Contracts Sec. 45 (W.H.E. Jaeger 3d ed.1957)), Tomsco has argued that the added language proves that the letter was not a contract.
 
 
 16
 However, the magistrate judge did not commit clear error in finding that all material terms were agreed upon and that the language of the letter as a whole constituted a binding contract, not simply an agreement to negotiate. The Tomsco doctors already possessed a copy of the standard service contract, the copy previously signed between Bhalla and Fonar, when the doctors signed the letter-fax, and therefore the statement added at the end of the letter did not leave material terms undecided. The language at the beginning of the contract regarding structuring the agreement was introductory; the letter then proceeded to structure an agreement, and the parties engaged in negotiations which resulted in changing the letter to reflect a $7,500 monthly figure rather than the initial offer of $10,250.
 
 
 17
 Moreover, performance by Tomsco under the contract, the monthly payments of $7,500, induced Fonar reasonably to rely on the contract and begin servicing the MRI machine. Fonar did rely on the contract, performing servicing in excess of $100,000 over a period during which Tomsco was paying $7,500 per month ($30,000 in the aggregate). Thus the performance under the contract here was not only some evidence of a binding contract, see Phoenix Mutual Life Insurance v. Shady Grove Place, 734 F.Supp. 1181, 1187 (D. Md.1990), aff'd, 937 F.2d 603 (4th Cir.1991) (citing Teachers Ins. & Annuity Assoc. v. Tribune Co., 670 F.Supp. 491, 499-503 (S.D.N.Y.1987)), but may even have risen to the level of estoppel, see AddressographMultigraph Corp. v. Zink, 273 Md. 277, 329 A.2d 28, 31-32 (1974).
 
 
 18
 Tomsco has also claimed that witnesses for both parties testified that the parties did not intend the letter to be binding. Tomsco has asserted that Fonar's official testified that Fonar wanted to wait until the MRI machine was inspected before committing. Yet this misstates the evidence--Fonar's official stated that Fonar wanted an assurance that Fonar's up-front costs would be covered in whatever condition Fonar found the machine, and accordingly he placed the $25,000 clause in the letter. Tomsco's witness, one of the doctors in the Tomsco group, did testify that the doctors did not want to commit to a service contract until the doctors had a contract with Bhalla for use of the machine. However, the magistrate judge found that testimony not credible in light of the education level of doctors and their concomitant ability to read and understand a document before signing at the notation "Agreed and accepted." Additionally, the magistrate judge noted the evidence of commitment in the fact that the doctors actively negotiated the $7,500 monthly payment term of the contract before signing the contract.
 
 
 19
 Thus, we affirm the magistrate judge's finding that Fonar's letter constituted a binding contract.
 
 II. The $25,000 per month provision
 
 20
 The district court's findings regarding whether the $25,000 clause was a penalty is a question of law, Anne Arundel County v. Norair Engineering Corp., 275 Md. 480, 341 A.2d 287, 294 (1975); H.J. McGrath Co. v. Wisner, 189 Md. 260, 55 A.2d 793, 795 (1947), and the findings regarding whether the clause was agreed to by the parties is a question of fact. We review the former de novo, as we do all issues of contract construction, Nehi Bottling Co., Inc. v. All-America Bottling Corp., 8 F.3d 157, 162 (4th Cir.1993), and the latter for clear error, F.R.Civ.P. 52(a).
 
 
 21
 Turning first to the question as to whether the provision was agreed to by the parties, the Tomsco doctors have argued that Tomsco never agreed to the following clause in the November letter signed by both parties: "If less than a full year of service is taken, the rate per month is $25,000." The magistrate judge's finding that the doctors were capable of reading all sentences in the November letter, and by their signatures agreed to the terms of the letter, including that clause, was not clearly erroneous. The magistrate judge was a fact finder and his judgment on credibility is to be deferred to. Here the magistrate judge stated that the Tomsco doctor's testimony that the doctor did not know about the $25,000 provision was not credible.
 
 
 22
 In the alternative, Tomsco has argued that "[i]f less than a full year ... is taken" should be construed as creating a $25,000 per month option in the contract, an option never exercised by Tomsco because Tomsco chose $7,500 per month on a month-to-month basis instead of $25,000 for a specific period of less than one year. The argument, in substance, is that the $25,000 was an alternative, unexercised option under the contract rather than a liquidated damages provision. Cf. Carlyle Apartments Joint Venture v. AIG Life Ins. Co., 333 Md. 265, 635 A.2d 366, 371 (1994) (" 'Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make a payment of the amount an alternative performance under the contract ....' " (quoting Restatement (Second) of Contracts Sec. 356)). Construing the contract de novo, Nehi Bottling, 8 F.3d at 162, we, like the magistrate judge, reject such an improbable interpretation of the contract.
 
 
 23
 The next question is whether the $25,000 per month agreed-upon term was an enforceable liquidated damages clause or an unenforceable penalty clause. Under Maryland law, the situs of the instant contract, a liquidated damages clause is enforceable only if it is a reasonable estimate of just compensation at the time the agreement was made. Massachusetts Indemnity & Life Ins. Co. v. Dresser, 269 Md. 364, 306 A.2d 213, 216 (1973). Additionally, a liquidated damages clause is not valid and enforceable unless actual damages for breach can not be accurately calculated at the time the contract is executed. Goldman v. Connecticut General Life Ins. Co., 251 Md. 575, 248 A.2d 154, 158 (1968). If a clause does not meet those conditions, i.e., if it is unreasonable as a forecast of compensation at the time made, or if it is clear that actual damages will be easy to calculate, it is an unenforceable penalty clause. Whether a provision is a penalty or an enforceable liquidated damages clause is determined in light of the circumstances at the time of contracting, not after breach. Baltimore Bridge Co. v. United Railways & Electric Co., 125 Md. 208, 93 A. 420, 422 (1915), quoted with approval in Schrier v. Beltway Alarm Co., 73 Md.App. 281, 533 A.2d 1316, 1320 (1987). See also Traylor v. Grafton, 273 Md. 649, 332 A.2d 651, 659-65 (1975) (surveying the law regarding the distinction between penalties and liquidated damages).
 
 
 24
 In the circumstances present at the time of contracting here, the actual amount of damages were impossible to predict with any accuracy; Fonar had not yet inspected the MRI machine because Tomsco wanted a technician to repair the machine immediately, without waiting for an inspection. Whether the liquidated damages amount was a reasonable estimation of compensatory damages at the time of contracting, however, is a question to which the answer depends on the timing of the breach. The damages were fixed on a monthly basis, in that Tomsco by the contract terms had to pay the $25,000 only for those months in which it used the machine, and thus the damages were calculated more precisely than, for example, a lump sum for failure to maintain the contract for a year. Such lump sums have been declared invalid as penalties. See Louis Dreyfus Corp. v. 27,946 Long Tons of Corn, 830 F.2d 1321, 1331-32 (5th Cir.1987) (invalidating clause providing for a $30,000 per day charge for failure to vacate a loading berth for any period of time which was part of a day, even a single hour, when the berth was normally rented by the hour and $30,000 represented 24 hours of rental). However, the amount was estimated based on Fonar's estimate of start-up costs in getting the machine operating again, which would perhaps be, according to Fonar's own witness, $25,000 per month for several months. Looking at the contract at the time it was made, ex ante breach, the terms of the provision would allow Fonar to recover $25,000 from Tomsco even if Tomsco had not breached until the eleventh month, but had failed to maintain the contract the full year. A $275,000 liquidated damages provision for eleven months of servicing (even reduced by a set-off of $82,500, assuming Tomsco would have paid $7,500 for each of the eleven preceding months) would be unreasonable, even "grossly excessive and all out of proportion" see Baltimore Bridge Co., 93 A. at 422 (the amount will be found to be a penalty if "grossly excessive and out of all proportion to the damages that might reasonably have been expected to result"), and thus unenforceable as a penalty.
 
 
 25
 When the contract was formed, Fonar apparently was willing to accept as a reasonable forecast of its expenses $90,000, the amount Fonar would receive for servicing if the contract remained in force for twelve months as contemplated (12 months X $7500 per month). The willingness of Fonar to contract for a maximum aggregate payment of $90,000 if the contract were to run for a full year, the anticipated life of the agreement, in effect sets a cap on a reasonable payment for services rendered. Hence, we interpret the $25,000 clause to be an enforceable liquidated damages provision only up to $90,000. The $90,000 figure appears a reasonable estimate of the value of services projected to be rendered for a five month period, viewed from the time of contracting. Thus, the damage award here can be no more than $60,000 ($90,000 less $30,000 already paid by Tomsco to Fonar in the $7500 monthly payments).
 
 III. Servicing the MRI machine
 
 26
 At trial, Tomsco asserted the affirmative defense that Fonar had breached the contract by improperly servicing the MRI machine prior to Tomsco's refusal to pay for servicing. We review the magistrate judge's factual finding that Tomsco had not proven by a preponderance of the evidence the affirmative defense of prior breach, see Boston Iron & Metal Co. v. United States, 55 F.2d 126, 127-28 (4th Cir.), cert. denied, 286 U.S. 558 (1932) (question of breach is a question of fact), for clear error, see F.R.Civ.P. 52(a).
 
 
 27
 There was scant evidence presented at trial on the issue of Fonar's servicing. Although one of the Tomsco doctors, Dr. Sant Antonio, stated that the MRI machine was down 5 percent of the time, and Tomsco's attorney argued that the performance was therefore "unacceptable," no experts on MRI machine operation were presented. In fact, Sant Antonio additionally stated that the doctors were not involved in the operation or maintenance of the MRI machine--they simply sent patients to Bhalla and looked at the MRI images which came back. Although Tomsco was clearly dissatisfied with the results, and thus decided to terminate the contract in April, there was no evidence as to whether the dissatisfaction was caused by poor servicing on the part of Fonar or poor operation on the part of Bhalla. Fonar's servicing technician testified that the machine was up 97 percent of the time, and that that was "excellent" up time.
 
 
 28
 In light of that evidence, we find that the magistrate judge's finding that Fonar was not proven to have breached the contract was not clearly erroneous.
 
 CONCLUSION
 
 29
 Accordingly, we affirm the district court's verdict for appellee Fonar Corporation, vacate the district court's damage award, and remand with directions to enter a damage award of $60,000 against appellant Tomsco Imaging, Incorporated. The judgment is
 
 
 30
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.